**KRAFT REINSURANCE IRELAND, LTD., Plaintiff,**

v.

**PALLETS ACQUISITIONS, LLC, d/b/a Atlanta Pallet Company, Defendant.**

**Civil Action No. 1:09–CV–03531–AT.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 5, 2011.

Edwin D. Robb and Todd M. Baiad, Bouhan Williams & Levy, for Plaintiff.

Lisa K. Whitfield and William Terrence Casey, Jr., Hicks Casey & Foster, Laurel E. Henderson and William Charles Hayes, Henderson & Hundley, P.C.; Wendell K. Willard, Law Office of Wendell K. Willard, for Defendant.

### *ORDER*

AMY TOTENBERG, District Judge.

The Court previously denied Defendant's Motion for Summary Judgment [Doc. 61] but found Plaintiff responsible

for spoliation of evidence highly relevant to Plaintiff's damage claims arising from mold contamination of containers of goods shipped to Central America. [Doc. 61 at 35.] As insufficient evidence had been submitted to determine whether sanctions or remedial measures at trial would be warranted, the Court conducted a hearing on spoliation issues on November 7, 2011. After carefully considering the arguments and evidence presented at the hearing, the Court concludes that spoliation remedial sanctions should be imposed based on Plaintiff's prejudicial failure to preserve any portion of evidence critical to the claims in dispute or to make other arrangements for Defendant's inspection of a sample of such evidence.

## I. Background Facts

Kraft Reinsurance Ireland, Ltd., ("Kraft Reinsurance" or "Plaintiff") is an insurance company which provides cargo insurance to Kraft Foods International, Inc. and Kraft Foods Global, Inc. ("Kraft Foods"),[1] which produce and export food products. (Doc. 61 at 3.) Pallets Acquisitions, LLC, d/b/a Atlanta Pallet and Services ("Atlanta Pallet" or "Defendant") manufactures and sells wooden pallets for use in shipping products domestically and abroad and ex- clusively supplied heat-treated wooden pallets[2] to Kraft Foods' Norcross, Georgia distribution center (the "Norcross warehouse") from December 2006 until November 2007. (*Id.* at 3–5.)

During late 2007, Kraft Foods employees loaded food products onto wooden pallets that Defendant purportedly supplied[3] and into freight containers at the Norcross warehouse for shipment to Panama. (*Id.* at 5.) After this cargo arrived in Panama in November 2007, inspectors found that it had become contaminated with mold. (*Id.* at 7.) Panamanian officials quarantined the containers and ordered an inspection and analysis of the mold. (*Id.*) Kraft Foods was notified of the problem and sent its local representative, Jorge Sanchez, to oversee the inspection process. (*Id.*) It notified its insurance agent, Steve Jarrett of W.K. Webster[4], who requested that Rafael Rivera, a marine surveyor and insurance adjuster, inspect the contents of the containers and verify damage to the merchandise. (*Id.*) Sanchez and Rivera performed a visual inspection in conjunction with Panamanian officials and found substantial mold growth. (*Id.* at 8.) After a Panamanian expert subsequently determined that the mold could be hazardous to humans and animals, Panamanian officials

1. Kraft Foods International, Inc. and Kraft Foods Global, Inc. are subsidiaries of Kraft Foods, Inc. For simplicity and because there is no dispute over the ownership of these companies or the authority of their agents, the Court will refer to them collectively as "Kraft Foods."

2. International standards required Kraft Foods to use heat-treated pallets for its overseas shipments. (Doc. 61 at 4, n.2.)

3. As discussed later herein, a factual dispute remains regarding whether Kraft used Atlanta Pallet's heat-treated pallets intended for international shipping in this shipment. The evidence indicates that Atlanta Pallet supplied heat-treated pallets exclusively to the Norcross warehouse during the prior year for international shipping as well as nonheat-treated pallets for domestic use. Defendant's counsel argued at the spoliation hearing that Plaintiff could have checked the heat-treatment stamps on the pallets and have conclusively verified that the contaminated pallets indeed were heat-stamped and produced by Atlanta Pallet, but failed to do so. While Defendant now appears to concede that the pallets at issue were produced by it, some question exists as to whether the Kraft's Norcross warehouse used Atlanta Pallet heat-treated pallets intended for international shipment or not.

4. According to Mr. Balogh, W.K. Webster functions as the clearinghouse for its insurance claims with Kraft Reinsurance.

ordered Kraft Foods to either ship the cargo back to its port of origin or to destroy it. (*Id.*)

Kraft Foods representatives in the United States first became aware of the mold contamination of its overseas shipments to Panama and Guatemala on or about November 13, 2007, after receiving an email from one of its representatives in Costa Rica. Soon thereafter, discussions began as to the possible root cause of the mold. (Testimony of Steve Balogh; D–Ex. 4, 6, 8–14.) Steve Balogh was Kraft Foods' lead representative in investigating the pallet mold problem and coordinating with its insurance carrier.[5] Mr. Balogh initially considered the possibility that the mold had been caused by the failure of various Kraft Latin American facilities to insert desiccant bags in the containers so as to dry the moisture that accumulates in the containers as a result of excess humidity in the environment. Although another Kraft representative wanted to create a task force to determine the root cause of the mold, Mr. Balogh thought it better to hold off on the task force to see if use of desiccants would resolve the mold problem. He also wanted to check whether the food containers being shipped out of the Kraft Norcross warehouse were being cleaned properly to food grade level prior to their pick-up and loading with food sup-

plies. (Testimony of Balogh; D–Ex. 6 & 8, Balogh email of November 14 & 23, 2007.)

Mr. Balogh testified that in assessing the mold source problem, he also considered it extremely important to determine if the pallets had been heat-treated and by what supplier—and to obtain photographs of the heat-treatment stamp on the pallets.[6] (*See also*, Ex. D–5.) Although he testified that he had seen photographs reflecting such heat stamp branding, apparently his testimony was in error. No such photographs are in existence. Plaintiff now seems to suggest that that Mr. Balogh may have been referring to photographs he had seen of the contaminated containers and pallets manufactured by U.S. Pallet Supply—not Atlanta Pallet, (Doc. 74 at 6–7; Doc. 76 at 4), though the heat-treatment stamp does not appear on these photos either. In any event, the existing photographs of the Atlanta Pallet shipment do not show the heat-treatment stamps on any of the pallets. Indeed, Kraft Foods' Panamanian Customer Supply Manager noted in an email on November 13, 2007, that health department officials inspecting the containers "commented off line that the containers did not come with heat-treated pallets and assume this is one of the causes of moth [sic] in the containers."[7] (Ex. D–4.)

---

**5.** Mr. Balogh is the Team Leader of the Customer Logistic Section in the Export Supply Chain Operations Department at Kraft Foods International.

**6.** On November 14, 2007, Balogh, emailed his colleagues in Panama that he wanted to see photographs of the pallets as he "definately [sic] need[ed] to see if the pallets had a branding that shows them as being heat-treated and then I can proceed." (Ex. D–5.)

**7.** Based on the incongruity in the record as to whether additional photographs existed showing the specific heat-treatment stamp of the pallets, the Court requested that Plaintiff's counsel make further inquiries regarding

available photographs and clarify the record regarding the pallets shown in the photographs submitted. Even after Plaintiff's filing of new evidence as recently as December 1, 2011, Plaintiff has not shown evidence of Atlanta Pallet's heat-treatment stamp on the pallets. Having failed to show the heat-treatment stamp of the pallets, Plaintiff has now tendered evidence that its practice was to distinguish heat-treated from nonheat-treated Atlanta pallets using a red paint brush mark— a mark that does appear in some of the photographs Plaintiff has submitted. (Doc. 76.) The Court notes that while Plaintiff has submitted a filing verifying that all photographs have now been submitted (Doc. 74), it has relied on W.K. Webster to provide photo-

As late as the afternoon of November 26, 2007, Mr. Balogh asked that the affected product and containers in Panama not be destroyed as he wanted to talk with the company's quality assurance staff to obtain assistance in determining the source and scope of the mold problem in each container. (Testimony of Balogh, D–Ex. 9.) However, on the next day, November 27, 2007, Mr. Balogh sent a letter to Atlanta Pallet's General Manager Zilhad Dzihic warning that Kraft Foods would hold Atlanta Pallet fully liable for losses resulting from the mold contamination and informing him that Kraft Foods' insurance carrier would be in touch with him shortly. (D–Ex. 1.) Mr. Balogh testified that on that same day, November 27th, he received information from the Kraft Norcross warehouse regarding their rejection of several Atlanta Pallet shipments of pallets due to mold detected on the pallets upon delivery. Swiftly concluding that the pallets were the likely source of the mold, Mr. Balogh immediately sent his notice letter to Atlanta Pallet regarding its liability.[8]

Atlanta Pallet's President William Jeffries Lewis' testified that after receipt of this letter, he sent representatives to the Norcross warehouse to discuss the letter and possible measures to mitigate mold formation. Although this meeting occurred, Kraft and Atlanta Pallet representatives never in fact discussed the Panamanian shipment specifically. Instead, the meeting concluded with Atlanta Pallet's agreement that it would send a follow-up letter regarding suggested mold mitigation measures, which it in turn provided on November 29, 2007. (D–Ex. 2.) The evidence established that neither Kraft Foods' insurance company nor Kraft itself subsequently contacted Atlanta Pallet regarding the Panamanian shipment loss, despite the representation in Mr. Balogh's November 27th letter that Kraft's insurance carrier would make such contact. Mr. Lewis thought he had resolved Kraft's complaint by sending his representatives to meet with the Kraft Norcross warehouse representatives and because he heard nothing more from Kraft's insurance carrier prior to being served with this lawsuit in January 2010.[9] Atlanta Pallet in turn did not conduct any further follow-up after sending its letter of November 29,

---

graphs that its Panamanian adjuster had not maintained in his database or file. Mr. Rivera's deposition indicates that he did not provide W.K. Webster with all of his photos and that he maintained approximately twice as many photos as the 26 he included in his insurance report on this claim. (Doc. 54 at 20.) Accordingly, the Court must still conclude that some of the photos may not have been maintained or produced by Kraft's representatives. That said, the photos Mr. Rivera took are of minimal utility, as they do not show the water or mold conditions surrounding or inside of the containers—or the heat-treatment stamps on the pallets—or the holes that may have been apparent on some of the containers (Doc. 54 at 22–23.)

8. Kraft's customer service and logistics representative for Central America, John Kosiorek, sent an email dated November 28, 2007, to Balogh and others in the company suggesting

that "we should look at our options to get this claim against the pallet provider so that we don't take [the hit] against our premiums." (Exhibit D–11.) Mr. Balogh testified that Kosiorek did not understand that a claim with Kraft's insurer would be filed whether or not a claim was also filed against Atlanta Pallet for cost indemnification. The email exchange, nevertheless, still confirms that Kraft officials were clearly looking at Atlanta Pallet in late November 2007 as a target of Kraft's legal claim for damages asserted in connection with the loss and destruction of the containers and their contents.

9. As Kraft continued to order Atlanta Pallet's product for domestic transportation, though it ceased using their pallets for international transit, the Court infers that Mr. Lewis might have also decided not to rock the boat in his customer relations with Kraft.

2007, to Kraft regarding suggested mold remedial measures and did not ask to inspect the contaminated containers thereafter.[10]

On November 27, 2007, Mr. Balogh authorized the containers' destruction, even though his email of the preceding day had requested the preservation of the containers in Panama for further investigation. Mr. Balogh testified that with the Norcross warehouse's receipt of the new shipment from Atlanta Pallet, Kraft concluded it had identified the source of the mold, had put the responsible party on notice (that same day) and therefore could proceed with the containers' destruction. In his view, Kraft's insurance carrier (Kraft Reinsurance) would be responsible for making any decisions required as to obtaining and retaining a sample of the potential evidence—in this case the moldy pallets, containers, and their food cargo. As he testified, if the insurance carrier wanted to obtain and retrieve evidence for purposes of handling the claim, the carrier would be responsible for hiring and instructing its surveyor/claims adjuster in Panama to make that arrangement.

Kraft Foods personnel deliberated over whether to send the shipment back to the United States or authorize its destruction in Panama. Mr. Balogh testified that he determined it would be less expensive for Kraft to arrange for the goods' destruction in Panama as additional charges would continue to accrue if United States Customs did not clear the goods for entry into the United States and other expensive complications were entailed as well in shipping the goods back to the country.[11] Over the course of more than two months—from December 13, 2007 to February 20, 2008—all of the cargo, including the food products and the pallets on which they sat, was incinerated in the presence of both Sanchez and Rivera. (Elizondo Depo. at 16 and Depo. Ex. 1B [65–2 65–4].)[12] Prior to this destruction, Plaintiff made no effort to inspect the cargo to determine the cause of the mold or to preserve any samples of this physical evidence.[13] (Doc. 61 at 11.) Balogh testified that it would have been Kraft Foods' insurance company's responsibility to preserve this physical evidence or arrange for such an evaluative inspection. (By con-

10. Mr. Lewis testified that if he had thought that Kraft actually intended to pursue the claim against Atlanta Pallet for losses from the mold contamination of the Panama cargo, he would have contacted his own insurance carrier for advice and would have asked Kraft if his representatives could inspect the contaminated product, because this was the first time anything like this had arisen for the company.

11. In fact, the cargo's destruction over two months in Panama turned out also to be a very expensive, slow enterprise.

12. Mr. Elizondo, another surveyor and adjuster, was employed to represent the shipping line to assess the contaminated goods. His detailed report, contrary to that of Mr. Rivera (the surveyor/shipper for Kraft Reinsurance) specifically reflects that incineration activity continued through February 20, 2008 for all

three Kraft shipments that had arrived in October and November 2008 from Savannah and that Mr. Rivera was present as a "participant" during the operation. Both Elizondo and Rivera's reports identify identical container numbers. Mr. Elizondo's report further states that on February 27, 2011, this information was confirmed with Naves Supply. Plaintiff conducted and filed this deposition (and the attached report) and has not endeavored to rebut this information, even though Mr. Rivera's report cites January 21, 2008, as the last date of incineration. Mr. Rivera's report also identifies Mr. Elizondo as present during the containers' incineration.

13. The evidence before the Court indicates that Mr. Rivera, the surveyor/claims adjuster, was never asked to determine what caused the mold or preserve any evidence. His inspection was limited to inspecting and verifying the damage to the cargo. (Doc. 61 at 11.)

trast, Balogh's responsibility was to make a decision whether to return the containers to the port of departure or destroy the containers in Panama.) There is no evidence in the record indicating why Kraft Reinsurance failed to take action to preserve any container and pallet samples whatsoever.[14] In any event, Atlanta Pallet was never notified that the cargo was being destroyed during this period of more than two months. (Testimony of William Jeffries Lewis.)

Mr. Balogh indicated he was confident that he had identified the source of the containers' rampant mold when he sent Atlanta Pallet its notice of liability claim on November 27, 2007. Yet only two months later, after Kraft had ceased usage of Atlanta Pallet's product for international transportation, another mold contaminated Kraft shipment arrived in Panama. When Balogh received notice of this shipment from Kraft's Panamanian representative, he responded by email on January 31, 2008 in shock, "Holy cow, this is unbelievable. I am not sure why this issue is focused on Panama. What do you guys have in the air down there?" (D–Ex. 13.) At that juncture, Mr. Balogh testified that he was left scratching his head as he couldn't make a determination as to the causation for the containers' mold contamination. Kraft was in the process of using different strategies to address the contamination challenge, including changing pallet vendors, using vendors of heat-treated wood and desiccants in all Central American shipments and finally, moving to exclusive use of CHEP (a company) heat-treated pallets. Yet in February 2008, two more containers, shipped from Kraft's warehouse in Champagne, Illinois arrived in Panama with mold contamination. (D–Ex. 14.) Again, Mr. Balogh's contemporaneous email correspondence reflects his frustration in getting to the bottom of assessing the source of the mold contamination problems. After the Illinois shipment, he wrote, "With this occurrence, logic would dictate that the problem could be occurring in Panama since we've now lost one of our common denominators in Norcross." (D–Ex. 14.) Mr. Balogh testified that he shared his emails concerning these subsequent mold contaminated shipment problems with Kraft's insurance carrier, the Plaintiff in the instant case.

In the summer of 2008, several months after the contaminated cargo had been destroyed, Plaintiff's counsel retained Dr. Marshall White, a consultant and retired professor from Virginia Tech's Wood Science and Forest Products department, to provide an expert report, which he eventually submitted in April 2010, and later supplemented in October 2010. (White Depo. [36–6] 5–10, 28.) After examining photographs, inspection reports, and deposition testimony and after speaking with Kraft Foods personnel, Dr. White concluded that the mold was caused by excessive moisture in the pallets, which was a result of Atlanta Pallet's alleged failure to implement a proper drying procedure. (White Aff. Ex. 1 [42–3].) Plaintiff filed its complaint in this matter on December 15, 2009, one and a half years after its initial retainer of Dr. White.

## II. Analysis

At the hearing, Atlanta Pallet's counsel asked the Court to sanction Plaintiff for spoliation of the contaminated cargo by (1) excluding Dr. White's testimony and/or (2) imposing an adverse jury instruction.

 In a diversity suit, federal law governs the imposition of spoliation sanctions because they "constitute an eviden-

---

14. When asked at the hearing specifically why Plaintiff failed to preserve any samples of the evidence, Plaintiff's counsel was not able to offer any explanation either.

tiary matter." *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir.2005). As the Eleventh Circuit noted in *Flury,* Georgia law informs this determination as it is consistent with federal spoliation principles and provides useful specific guidelines for resolving disputes involving potential spoliation sanctions. *Id.* District courts have "broad discretion ... to impose sanctions." *Id.* "[I]n determining whether sanctions for spoliation are warranted, the trial court must weigh the degree of the spoliator's culpability against the prejudice to the opposing party." *Bridgestone/Firestone N. Am. Tire, LLC v. Campbell,* 258 Ga.App. 767, 574 S.E.2d 923, 927 (Ga.Ct.App.2002); *Flury,* 427 F.3d at 946. Five factors guide the Court while performing this balancing test: "(1) whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded." *Flury,* 427 F.3d at 945, *citing Bridgestone/Firestone N. Am. Tire, LLC.,* 574 S.E.2d at 926. As sanctions for spoliation, the Court is authorized based on its evaluation of the evidence to impose the sanction of (1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator. *Flury,* 427 F.3d at 945, *citing Chapman v. Auto Owners Ins. Co.,* 220 Ga.App. 539, 469 S.E.2d 783, 784 (Ga.Ct.App.1996).

■ The first three factors address the question of whether Defendant has been substantially prejudiced in the trial of this matter by the spoliation of evidence and if so, whether this prejudice can be cured. The evidence here indicates that Atlanta Pallet was indisputably prejudiced by the destruction of crucial evidence. Atlanta Pallet was clearly prejudiced because it was denied the opportunity to inspect the contaminated cargo in order to determine whether its heat-treated pallets caused the mold infestation or whether it was due to some other cause, e.g., particular food items inside the container, warehouse conditions distinct to Panama, unanticipated extraordinary moisture conditions (accumulated water) in the storage area, Kraft's failure to use desiccants in the containers, Kraft's possible use of nonheat-treated pallets instead of heat-treated ones manufactured by Atlanta Pallet, etc. This prejudice is incurable because Plaintiff's failure to provide Defendant with an inspection and testing opportunity or alternatively, failure to preserve any samples with an eye toward evaluation of causation leaves Atlanta Pallet with an inadequate first-hand evidentiary basis for constructing a full defense.

Testing and inspection of the moldy goods, containers, pallets, and water on the storage floor were obviously of crucial practical importance in proving or disproving whether the pallets were the proximate cause of the containers' mold contamination or whether other factors were at play. The limited series of photographs taken of the cargo and opportunity for after-the-fact expert postulations about the experience in the pallet industry simply do not substitute for providing Defendant the means to test a sample of the contaminated goods or to conduct a first-hand expert examination of the containers and their storage conditions. The inadequacy of the photographs retained—and the absence of photos reflecting the heat-treatment stamp of the provider—compounds this problem. For all of these reasons, the first three factors relating to prejudice weigh in Atlanta Pallet's favor.

Analysis of the fourth factor—whether the spoliator acted in good or bad faith—leads to the conclusion that Plaintiff's fail-

ure to preserve evidence constituted a lack of good faith. Plaintiff does not deny that Kraft Foods intentionally destroyed the evidence or that Kraft Reinsurance failed to take any steps to preserve a sample of the evidence. The Court finds Kraft's ultimate decision to incinerate the containers was not based on malice as Kraft reasonably based its decision on the Panamanian customs officials' directive to either destroy the goods or ship them back to the United States as well as relevant cost considerations. However, evidence of bad faith still is apparent here based on the Plaintiff Kraft Reinsurance's failure to take any measures to preserve samples of the evidence or provide Defendant with the opportunity to inspect the contaminated containers during the two plus months over which the incineration process was slowly implemented. The evidence makes clear that the responsibility for making such arrangements for inspection or sampling and preservation lay clearly with Kraft Reinsurance. The significance of providing such an opportunity for firsthand review is made clear by Steve Balogh's email of November 26, 2007, (D–Ex. 9), requesting the preservation of the containers for evaluation by the company's own quality assurance team just one day before Balogh concluded that Atlanta Pallet must be responsible for the cargo contamination.

■ "Georgia law does not require a showing of malice in order to find bad faith." *Flury,* 427 F.3d at 946 (*citing Bridgestone/Firestone,* 574 S.E.2d at 927); *Graff v. Baja Marine Corporation,* 310 Fed.Appx. 298, 302 (11th Cir.2009); *National Grange Mutual Insurance Co. v. Hearth & Home, Inc.,* No. 2:06–CV–54– WCO, 2006 WL 5157694 at *5 (N.D.Ga. Dec. 19, 2006). *See also Chapman v. Auto Owners Ins. Co.,* 220 Ga.App. 539, 469 S.E.2d 783, 785 (Ga.Ct.App.1996) (basing its holding in part on persuasive authority from *Northern Assurance Co. v. Ware,* 145

F.R.D. 281 (D.Me.1993), which precluded the plaintiff's expert from testifying despite a lack of evidence that the destruction was malicious). In Chapman, the court pointed out that insurance companies generally have a duty to preserve evidence:

> "[t]his is not a case in which the conduct of a lay person, inexperienced in litigation, has resulted in the destruction of evidence. This is a case brought by an insurance carrier. Insurance companies are no strangers to litigation.... Plaintiff was palpably remiss in *failing to make reasonable arrangements* within the range of possibility to preserve the evidence."

*Chapman,* 469 S.E.2d at 785 (quoting *Ware* ) (punctuation omitted). *Accord, National Grange Mutual Insurance Co.,* 2006 WL 5157694 at *6 (Plaintiff insurance company should reasonably have anticipated litigation stemming from the fire at issue and therefore was deemed to demonstrate bad faith based on its failure to preserve relevant evidence for observation and full testing.).

As an insurance company, Plaintiff reasonably should have anticipated litigation stemming from the cargo contamination after Kraft sent its notice of liability to Atlanta Pallet on November 27, 2007. Indeed, the insurance company's clearinghouse had already by that date dispatched a Panamanian marine surveyor/insurance adjuster to the port to deal with the contaminated cargo. Kraft Reinsurance therefore knew it had a duty to preserve evidence for the subrogation claim against Defendant. *Id.* at *6. Similarly, as the incineration process extended over several months once the decision had been made to destroy the containers, Kraft Reinsurance was duty bound to give Atlanta Pallet timely notice regarding the destruction of the evidence in the event Atlanta Pallet wished to examine the condition of the containers and pallets prior to their total

destruction. The need for an examination to analyze the source of the mold, in fact, should have become even more evident as additional containers arrived in Panama in January and February 2008 (prior to the complete destruction of the containers) manifesting mold contamination, even though the pallets were produced by manufacturers other than Atlanta Pallet and shipped from a different Kraft warehouse.

Although Defendant could have affirmatively sought to examine the containers prior to their destruction, it reasonably relied on Mr. Balogh's written representation that Plaintiff's representatives would be in touch regarding the claim. Moreover, Atlanta Pallet did not know all relevant evidence was in the process of being destroyed in Panama and elsewhere. Nor could it have known that Plaintiff would fail to ensure that proper photographs were taken of the pallets' heat-treatment stamps, the containers' holes, conditions of storage or full contents. Moreover, the proper analysis in a spoliation case focuses on the "spoliator's culpability against the prejudice to the opposing party"—not the relative culpability of the parties. *Flury*, 427 F.3d at 946. For over two months, Plaintiff knew that the evidence it had a duty to preserve was being destroyed, and it failed to notify Defendant that it was slowly being incinerated and did not attempt to make any reasonable arrangements to preserve even a small sample. Such reckless disregard for potential prejudice to the opposing party, although not rising to the level of malice, amounts to bad faith, and thus the fourth factor weighs in favor of imposing sanctions. *Cf., National Grange Mutual Insurance Co.*, 2006 WL 5157694 at *6.

Finally, a clear potential exists here for Plaintiff's abuse of expert testimony, as the Defendant has had no opportunity to independently test or confirm the source of the mold contamination about which Dr. White will opine on behalf of Plaintiff. *See Flury*, 427 F.3d at 946 (excluding, as sanction for spoliation, plaintiff's car accident reconstruction expert's testimony based solely upon a post-incident evaluation—specifically, review of post-accident photographs and consideration of the accident report). The Plaintiff's case rests, as currently framed, in substantial part on the testimony of Dr. White, whose testimony is based on post-incident analysis of the circumstances surrounding the containers' mold contamination in conjunction with his expertise in the pallet and wood industry. Neither the Plaintiff's nor Defendant's expert in this case could actually conduct testing of the product at issue because of its removal and destruction. Faced with these circumstances, the Eleventh Circuit held in *Flury* that the "district court erred in concluding that a simple jury instruction could cure the resulting prejudice to defendant" where the vehicle's destruction "forced experts to use much less reliable means of examining the product's condition." *Id.*

Defendant cannot effectively rebut Dr. White's expert testimony because it has been deprived of the opportunity to obtain the most direct, reliable evidence of causation: an examination of the moldy products and pallets themselves and their storage environment(s). In sum, the potential for abuse of expert testimony clearly exists where Plaintiff stood idly by for over two months while key evidence was destroyed and now seeks to base its whole theory of causation on the testimony of a witness who, however well respected or experienced, never examined that evidence.

■ Similar to the situation in *Flury*, an adverse jury instruction is inappropriate here because it is not properly tailored to the circumstances [15] and because it will not

---

**15.** Adverse jury instructions are generally

more appropriate in situations where the evi-

cure the prejudice to Defendant. As there is great potential for abuse of expert testimony, excluding such testimony is the most appropriate sanction here and will more effectively cure the substantial prejudice that Defendant would otherwise incur in attempting to present its position. If Plaintiff is to convince a jury that Defendant's pallets caused Kraft's losses, it will have every opportunity to do so by proffering the testimony, photos, and reports of its witnesses who inspected the cargo and managed its handling and transport. To allow Plaintiff to also submit expert testimony on causation would give it an advantage that is unfair considering it failed to preserve the best evidence of causation and greatly prejudiced Defendant's ability to construct a full defense as a result.

## III. Conclusion

For the foregoing reasons, the Court **ORDERS** that Plaintiff's expert testimony relevant to causation of damages shall be excluded as a sanction for spoliation of critical evidence. This case shall be set down on the trial calendar to commence on January 17, 2012 at 1:30 P.M. The pretrial conference shall be conducted on January 6, 2012 at 2:00 P.M.

dence was damaging to the spoliator's case, and it is reasonable to infer that the evidence destruction occurred for that reason. *See, e.g., Bashir v. Amtrak,* 119 F.3d 929 (11th Cir.1997) (holding that adverse jury instruction is inappropriate under "adverse inference rule" were there is no evidence that purported spoliator "tampered with the evidence" or "purposely lost or destroyed" it because such a situation "does not sustain an inference of consciousness of a weak case") (internal quotes and citation omitted).